**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 13-1019**

RUSH INDUSTRIES, INC.,

            Plaintiff - Appellant,

      v.

MWP CONTRACTORS, LLC; BRANN'S TRANSPORT SERVICES, INC.,

            Defendants - Appellees.

Appeal from the United States District Court for the Middle District of North Carolina, at Greensboro.   Thomas D. Schroeder, District Judge.   (1:08-cv-00810-TDS-LPA)

Submitted:  July 25, 2013              Decided:  August 28, 2013

Before NIEMEYER, GREGORY, and DIAZ, Circuit Judges.

Affirmed by unpublished per curiam opinion.

Kenneth L. Jones, CARRUTHERS & ROTH, P.A., Greensboro, North Carolina, for Appellant.   Kenneth J. Gumbiner, HIGGINS BENJAMIN, PLLC, Greensboro, North Carolina, for Appellee MWP Contractors, LLC.   Stanley F. Hammer, WYATT, EARLY, HARRIS & WHEELER, LLP, High Point, North Carolina, for Appellee Brann's Transport Services, Inc.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Appellant Rush Industries, a furniture manufacturing company, challenges the district court's decision in favor of Appellee MWP Contractors, who coordinated shipping of a used panel saw that failed to operate upon arrival at Rush Industries' manufacturing plant. Finding no error, we affirm the district court's ruling.

## I.

In late 2006, Rush Industries purchased a used Italian-made Gabbiani panel saw through an internet auction for $14,300. Michael Rush, the owner of Rush Industries, purchased the saw for use at the company's plant in Americus, Georgia. An expert witness testified at trial that the twelve-year-old saw was already beyond its expected useful life. The bill of sale provides that Rush Industries made its purchase of the saw "AS IS, WHERE IS, WITH ALL FAULTS." After purchasing the saw, Rush traveled to South Boston, Virginia, where the saw was located in the facility of a defunct business called D-Scan. After Rush videotaped an operator make a successful demonstration cut using the saw, he made arrangements with MWP to disassemble, package, coordinate shipping, and install the saw at Rush Industries' Americus plant. Rush sent a check to MWP on December 8, 2006, for an initial payment of $5,300.

2

The saw remained in D-Scan's facility until January 8th, 2007. During that time, MWP made basic repairs to the saw at Rush Industries' request. MWP contracted with Appellee Brann's Transport Services to move the saw to Americus. MWP employees loaded the saw onto two Brann's trucks. However, MWP did not request that Brann's tarp the load.

Upon arrival, Rush and MWP's foreman discovered that the saw's ten ribbon cables and connectors had been damaged. Nonetheless, Rush accepted the shipment, and directed MWP to unload and install the saw, which was not operational without new connectors. MWP offered to locate new connectors. During January 2007, Rush contacted MWP at least twice to inform the company that he needed MWP to make the saw operational immediately to avoid losing orders that required use of the saw. According to MWP, because there were only a limited number of these saws manufactured overseas over a decade prior, it was difficult, yet important, to obtain the right replacement parts. Vicki Rush, Rush's wife, caused further delay when she provided MWP with the wrong serial number for the damaged parts.

On February 28, 2007, MWP sent Rush Industries a statement for the remaining $4,000 balance due for shipment. On April 9, 2007, Rush Industries filed a lawsuit against MWP in North Carolina state court. Unaware of the suit, Anthony Wilson, an employee for MWP, contacted Rush to arrange a time to install

3

proper connectors which he was finally able to locate. Rush explained that he had filed a lawsuit against MWP "for a million dollars" and refused to speak with Wilson or accept the cables and connectors he had obtained.

In January 2008, Rush's wife purchased replacement ribbon cables and connectors off the internet for $103.60, plus $14.63 for shipping. Rush's employees installed the cables and connectors. While the control panel for the saw lit up, the saw remained dysfunctional. Rush testified that he subsequently engaged several electricians and service companies in an attempt to diagnose and fix the problem. However, none could make the saw operational. Rush testified that the saw has no value in its current dysfunctional state because the cost to haul the metal exceeds the scrap value of the saw.

Also in January 2008, Rush Industries added Appellee Brann's as a defendant. This constituted Brann's first notice that the saw it had transported was not operational and that Rush Industries had filed a lawsuit. The complaint against MWP and Brann's alleged breach of contract, negligence, and bailment claims. Rush Industries sought recovery for value of the damaged equipment, lost income and profits, and additional consequential damages. MWP filed a counterclaim against Rush

4

Industries for unpaid invoices.[1] The Defendants removed the case to federal court in November 2008 on the basis that it fell under the purview of the Carmack Amendment to the Interstate Commerce Act, 49 U.S.C. § 14706.

On Defendants' motion for summary judgment, the district court dismissed Rush Industries' state-law claims for lost profits and its negligence claims insofar as they did not arise from bailment. It deferred judgment on the application of the Carmack Amendment. The parties tried the remaining issues in a bench trial in October 2012. The district court found that the Carmack Amendment preempted all state-law claims arising out of damage occurring during transportation of the saw. After re-characterizing state-law claims as federal-law claims, the district court awarded damages to Rush Industries in the amount of $118.23 for the cost of replacement ribbons and connectors, and to MWP for $6,388.59 for unpaid invoices. The district court dismissed all claims against Brann's.

Rush Industries' filed a timely appeal of which we have jurisdiction pursuant to 28 U.S.C. § 1291.

---

[1] Brann's and MWP also filed cross-claims for indemnification against any damages the court awarded. These cross-claims are not at issue here.

5

II.

We review a district court's judgments at a bench trial under a mixed standard:  factual findings for clear error and conclusions of law de novo.  Helton v. AT & T, Inc., 709 F.3d 343, 350 (4th Cir. 2013).

A.

Rush Industries first argues that the district court erred when it determined that its claims against MWP are covered by the Carmack Amendment.  Specifically, Rush Industries contends that the services provided by MWP fall outside the parameters of the Carmack Amendment because Brann's, not MWP, provided actual transport of the saw, and because MWP's services did not involve transport.

The Carmack Amendment is a "comprehensive exercise of Congress's power to regulate interstate commerce" that creates "a national scheme of carrier liability for goods damaged or lost during interstate shipment under a valid bill of lading." 5K Logistics, Inc. v. Daily Exp., Inc., 659 F.3d 331, 335 (4th Cir. 2011) (internal quotations and citations omitted).  It preempts all state or common law claims available to a shipper against a carrier for loss or damage associated with interstate shipments.  Shao v. Link Cargo (Taiwan) Ltd., 986 F.2d 700, 704-05 (4th Cir. 1993).

6

Contrary to Rush Industries' argument, the Carmack Amendment goes beyond the physical act of transportation to include associated services. See 49 U.S.C. § 13102(23). Further, it applies to a company, such as MWP, that is in contract with a shipper to handle the movement of property and subcontracts the actual physical shipping of the property in question. See, e.g., Land O'Lakes, Inc. v. Superior Serv. Transp. of Wis., Inc., 500 F. Supp. 2d 1150, 1155 (E.D. Wis. 2007) ("Liability under the Carmack Amendment . . . extends beyond the carrier who actually provides the transportation."); Mach Mold, Inc. v. Clover Assocs., Inc., 383 F. Supp. 2d 1015, 1029 (N.D. Ill. 2005) (explaining that the Carmack Amendment applies to a company that coordinates transportation, but does not actually transport the property in question). Even though Brann's may have owned and controlled the trucks that transported the saw, MWP's overall coordination of the shipping places it within the confines of the Carmack Amendment.[2] As such, we agree with the district court that the Carmack Amendment applies and preempts all tort and common law claims against MWP. See Shao, 986 F.2d at 704-05.

---

[2] While MWP's repair work and installation of the saw arguably falls outside the parameters of the Carmack Amendment, Rush Industries puts forward no evidence establishing that damage to the saw occurred during repair or installation.

B.

Rush Industries next argues that the district court erred when it granted partial summary judgment dismissing its claims for lost profits and negligence not arising out of the bailment. Given that the Carmack Amendment preempts Rush Industries' state and common law claims, we do not directly address this argument. Instead, we review the district court's treatment of the claims as re-characterized federal claims under the Carmack Amendment.[3] See Metro. Life Ins. Co. v. Taylor, 481 U.S. 58, 66-67 (1987) (explaining that a lawsuit that purports to raise only state law claims may be construed as raising federal law claims where complete preemption exists); Darcangelo v. Verizon Commc'ns, Inc., 292 F.3d 181, 195 (4th Cir. 2002) (construing state claims as federal claims where ERISA preempted state claims).

The Carmack Amendment establishes that a carrier is "liab[le] . . . for the actual loss or injury to the property" that occurs during shipping. 49 U.S.C. § 14706. This includes "all damages resulting from any failure to discharge a carrier's

---

[3] To recover under the Carmack Amendment, a plaintiff must make out a prima facie case establishing: (1) delivery to the carrier in good condition; (2) arrival in damaged condition, and; (3) amount of damages. Oak Hall Cap & Gown Co., Inc. v. Old Dominion Freight Line, Inc., 899 F.2d 291, 294 (4th Cir. 1990). The district court correctly found that Rush Industries had established the first two prongs of the prima facie case. Thus, we discuss only the third prong related to damages.

duty with respect to any part of the transportation to the agreed destination." Se. Express Co. v. Pastime Amusement Co., 299 U.S. 28, 29 (1936). As such, a plaintiff shipper can recover all reasonably foreseeable consequential damages and lost profits that are not speculative. Am. Nat. Fire Ins. Co. ex rel. Tabacalera Contreras Cigar Co. v. Yellow Freight Sys., Inc., 325 F.3d 924, 931 (7th Cir. 2003).

Rush Industries argues that the saw sustained irreparable damage because MWP "withheld replacement parts for some eight months" after it installed the saw at the Americus plant. Appellant's Br. 19. Because no individual or company can now fix the broken saw, Rush Industries urges that we find that it is entitled to the value of a comparable brand new saw. Further, Rush Industries claims that it is entitled to lost profits from contracts it could not fulfill because the saw was not made operable.

Rush Industries failed to present evidence establishing that any undue delay in replacing the ribbons and connectors caused the saw's permanently irreparable condition. At trial, Rush Industries presented only a single witness, Mr. Rush, who had extremely limited technical knowledge of the saw. In essence, Mr. Rush could say little more than that the saw was working when he saw it in South Boston and did not work after it arrived in Americus. MWP, on the other hand, presented several

9

witnesses with relevant specialized knowledge who explained that the saw, and particularly the saw's computer system, were obsolete and past expected functioning life. Further, an MWP witness who serviced this particular saw when D-Scan owned it testified that it was uncertain whether the saw would survive transportation from South Boston to Americus because "there are a lot of variables that happen during shipment," and that the vibrations during transport could cause problems with the saw's circuit board.

Even if Rush could have established that the inoperable condition of the saw was caused by MWP's lag in replacing the cables and connectors, Rush Industries' damages claim would result in an exorbitant windfall. Rush Industries purchased an outdated piece of machinery manufactured overseas in a small batch "AS IS, WHERE IS, WITH ALL FAULTS" for $14,300. A new replacement saw costs over a quarter-million dollars. Surely, MWP could not foresee that its failure to repair damage which occurred during shipping would require that it purchase a brand new saw.

Nor should MWP be held liable for Rush Industries' alleged lost profits in the aftermath of the January 2007 delivery. Rush Industries presented no evidence that the saw would have worked had MWP immediately replaced the cables and connectors. In other words, there is not sufficient evidence to conclude

10

that the problems with the saw upon arrival in Americus were limited to the cables and connectors.

There is also no viable evidence in the record that Rush Industries informed MWP that it had a "million-dollar contract," or any other contract for that matter, hinging on the timely delivery and operability of the saw. In fact, MWP did nothing to guarantee the operability of the saw after transport. Moreover, given the age, foreign origin, and limited number of these saws, it would have been difficult for MWP to obtain the appropriate replacement parts had Rush Industries provided correct information. However, Vicki Rush provided the wrong serial number to MWP, further delaying MWP's efforts to repair the saw. When MWP's representative finally contacted Rush to notify him that he had found the correct parts and to arrange for installation, Rush shunned his efforts.

The only damages that Rush Industries has established as attributable to MWP are for replacement cables and connectors. As such, we find that the district court correctly found that MWP's liability is limited accordingly.[4]

---

[4] Rush Industries' failure to establish damages beyond the replacement cost of the cables and connectors applies also to its claims against Brann's. Additionally, we agree with the district court that MWP and Rush Industries' claims against Brann's are time barred because neither informed Brann's of any claims or problems with the panel saw until January 25, 2008, well after the applicable nine-month notice requirement expired. (Continued)

11

III.

Rush Industries next argues that the district court erred when it refused to excuse its obligation to pay MWP for services rendered.[5]  MWP satisfied its contractual obligations pursuant to its agreement with Rush Industries.  MWP conducted repair work on the saw in South Boston per Rush Industries' request.  After shipment, MWP employees complied with Rush's instructions to unload and assemble the saw in Americus in spite of the damaged state of the cables and connectors.  We find no error in the district court's determination that Rush Industries must pay its past due bills to MWP.

IV.

Rush Industries took a risk in purchasing an outdated, used saw at a huge discount and then shipping it some 600 miles. Unfortunately for Rush Industries, the risk did not pay off. However, there is no legal basis for pushing the repercussions onto the company it enlisted to help with shipment.  We find no

---

See 49 C.F.R. pt. 1035, App. B ("As a condition precedent to recovery, claims must be filed in writing with the . . . delivering carrier . . . within nine months after delivery has elapsed.").

[5] MWP counterclaims for $2,388.59 for pre-shipment repairs it made to the saw in South Boston and $4,000 for unloading the saw and assembling it in Americus.

error in the district court's handling of this case and therefore affirm.

AFFIRMED